Burwell. Mr. Jed. Good morning, Your Honors. May it please the Court, Adam Jed for the United States. Your Honors, the plaintiffs don't want to provide contraceptive coverage and they don't have to. What they can do is the same thing that folks do around the country when they have religious objections, raise their hands and say, there's something we don't want to do, we think we're eligible not to do it, and therefore we choose not to do it. And the plaintiffs are okay with that. They don't take issue with that. Instead, what the plaintiffs object to is that if they choose not to provide contraceptive coverage, someone else will provide contraceptive coverage instead. And that really is a unique and novel conception of the kind of claim that can be brought under RFRA to collapse your decision not to do something with somebody else's decision to then do it instead. I thought their position, they can clarify or maybe I misunderstood, I thought their position was that they would not be objecting if the system were such that the government would then directly provide the service or pay for it. Your Honor, obviously we'll give them an opportunity to clarify exactly what their argument is. They've made kind of a couple of different versions of the argument in their brief, and at times the kind of versions actually seem to contradict each other a little bit. But their mainline argument is what they often term a trigger argument or a facilitation argument. They say that they object to the act of opting out because it's only if they opt out that then somebody else will step in. And I haven't heard them say that if, you know, rather than the government having Aetna provide coverage, instead the government itself provided coverage. And I'll explain in a moment why it is that just as a practical matter that wouldn't work, but I haven't heard them say that that would be acceptable to them, nor have I heard them say that if someone had Aetna and the government had Blue Cross step in, or if someone had Blue Cross and the government had Aetna step in, that that would be okay with them. Now, the plaintiffs have made a sort of additional argument, and Judge Smith, I think maybe this is the argument that your question is getting to, sort of separate and aside from their trigger theory, they have made an argument that they have an objection to being in, I think they phrase it being in a contractual relationship with a company that's going to provide contraceptive coverage. And I think that actually the best response to that argument is actually a concession that the plaintiffs seem to be making when they make their trigger argument, because what the plaintiffs seem to acknowledge is that you can't object simply to action being taken by a third party. Now, obviously the government imposes any number of legal obligations on companies that plaintiffs and other companies throughout the country do business with. And, you know, I can't say that I object to the fact that, you know, a company that I may buy a good from or a company who may, you know, kind of come to clean my office is under an obligation that I don't want them to be under. That really is then just an obligation, an objection to an obligation being placed on a third party. But Judge Smith, there's also just a practical response to your question, which is that, as I think in particular, the Supreme Court recognized in its Wheaton College order, after somebody opts out to be able to then satisfy the whole point of this program, to be able to make sure that women can, without barriers, get access to contraceptive coverage, you then need a kind of simple, easy framework. Now, the problem with maybe this alternative of the government stepping in if the plaintiffs opt it out, and again, I think when the plaintiffs refer to a government program, they're actually basically saying that their objection would require a single payer system where the government provides coverage to everyone, no matter what, regardless of whether their employer has opted out. But if they are making the argument that Your Honor points to, there are two problems. One is the Supreme Court actually just disclaimed this in Hobby Lobby. In response to the dissent, the Supreme Court said, oh, no, we're not requiring women to have to go out and sign up for a new and different program. And the reason for that actually just follows from the point of the contraceptive coverage requirement specifically, and in fact, the preventative services requirement as a whole, which is that extensive data showed, and you can find this in the Institute of Medicine report, and you can find this in some of the floor statements that were made by people who were arguing for having a preventative services requirement, that when it comes to getting these kinds of preventative services, even small burdens, small barriers, will often prevent women, and if we're not just talking about women's services, other preventative services will prevent people from accessing those services. And what you or I may think of as maybe not a particularly difficult task, still just as a practical matter, has resulted in people not getting the kind of coverage that they otherwise need to get. And that's why in Hobby Lobby, we have five justices who explicitly say it's a compelling interest, but the other four who just assume as much explicitly disclaim. They say, the consequence of our holding is not that women would have to go and sign up for a new government program. But the other problem with that alternative, Judge Smith, is simply that the government doesn't have statutory authority to be able to do that. I mean, you have Justice Kennedy, for example, in his concurring opinion in Hobby Lobby saying it's, you know, it's important to note that we're working with an existing program here. We're not saying that the government just has to go set up a new program. And, you know, obviously taken to its limit, that kind of argument would mean, for example, that if an employer had an objection to paying minimum wage to women who worked for the employer, that it would be okay because then the government would just step in and would just kind of make up the difference in salary. No one contends that that would be acceptable. And here you have three departments, the Department of Labor, the Department of Treasury, and the Department of Health and Human Services, who have essentially been given two different tasks by Congress. One of them is a set of authority under these various statutes to ensure that people get health coverage, including contraceptive coverage. And then the other is RFRA, which says, you know, you need to do this in a way that will not substantially burden the exercise of religion and, you know, at the same time will advance these compelling interests. And so the departments don't just have the statutory authority to just set up some entirely new program. But again, even if they did, nonetheless, that would essentially violate what the Supreme Court disclaimed in Hobby Lobby. And I think that's why the Wheaton College order then, I mean, essentially accepts exactly what the plaintiffs reject here. I mean, you know, to be fair, the Wheaton College order said it wasn't making a decision on the merits. But to the extent that the court does want to read into the Wheaton College order, it said that the plaintiffs can be made to take an affirmative act, to raise their hand, to say that we object, and then critically that the government can rely on that act. And the government made the same argument there that it made, that we're making here, where we said, look, we're going to just impose a legal obligation or offer to pay, depending on whether there's a church plan at issue, the same insurance company or third party administrator who works with these folks so that that insurance company or third party administrator can seamlessly provide coverage. And the Supreme Court said in response, well, they can take an affirmative act of notifying you, and then you, the government, can rely on that act to ensure the provision of coverage. So I do just want to point out then the because it would seem to follow from their argument that almost any scheme of religious accommodation itself is potentially infirm. There's the draft example that, interestingly, the plaintiffs try to argue why it is that the draft example is different, but in giving reasons why they think it's different, they themselves seem to be conceding, contrary to arguments that they make elsewhere, that the court really can engage in an inquiry and decide the question of law of what kinds of burdens count as substantial burdens. And the plaintiffs seem to ignore a number of the other kind of limitless examples that would follow from their theory. So, for example, I believe it was the Third Circuit decision ruling for the government gave the example of somebody who doesn't want to work on the Sabbath. And they said, you know, if you don't want to work on the Sabbath and you think it's wrong to work on the Sabbath, you raise your hand, you say to your boss, I don't want to work on the Sabbath. Now, the consequence may be that your boss says, okay, fine, you don't have to work on the Sabbath, but then assign somebody else to work on the Sabbath. But it's a different matter entirely to say, well, not only is it that I'm not going to work on the Sabbath, but also I'm essentially going to sort of filibuster the process of someone substituting for me. I'm not going to raise my hand. I'm just not going to show up for work. And, in fact, if you took plaintiff's argument to its logical conclusion, the person in that situation could even say the act of my staying home that day has now been turned into a trigger for somebody else working on the Sabbath. Similarly, you could take a variation of the Supreme Court's decision in Thomas. In Thomas, you had an individual who did not want to work on an assembly line making, I think it was tank turrets, and the Supreme Court stressed that he had looked for another factory that he could go work at, but there wasn't one available. And under the plaintiff's logic, if the individual in Thomas, in fact, had just said what he did say, which is I don't want to work on this assembly line, and his employer had said, okay, that's fine, you can go work on another assembly line. Nonetheless, that employee could have said, well, wait a minute, by me saying that I don't want to work here, I'm now triggering somebody else working here. And, again, I mean, that is just a novel and limitless conception of what could count as a substantial burden. And to the extent that the plaintiffs try to respond to these- But the counsel here, don't at least some of these plaintiffs argue that by self-certifying and exercising the opt-out provision, that's, in fact, triggering the coverage to which they object? Is that at least the argument of some of the plaintiffs? Sure, Judge Graves, that is the argument that they're making, and recognize that the person who doesn't want to work on an assembly line, or the person who doesn't want to work on a Saturday, or the person who doesn't want to fight in the military, could say my conscientious objector request, my request not to work on a Saturday, my declaration that I have an objection to making tank turrets, and so I need to work on a different assembly line, all of them could make that exact same point, that that's a trigger. And that's what's so unusual about the plaintiff's argument. I mean, plaintiffs are essentially reading the term substantial burden in RFRA as a nullity. I mean, we know that Congress added the term substantial burden during the drafting process for a specific reason, to make clear that not every kind of religious burden would be subject to RFRA's compelling interest test. I mean, we think we satisfy RFRA's compelling interest test, but just upfront to make clear that not every burden would be subject to RFRA's compelling interest test. They were trying to signal, I mean, the legislative history spells this out quite clearly, that they were talking about the sorts of burdens that the Supreme Court had recognized at that point. And so what's really paradoxical then about the plaintiff's argument is that even though they acknowledge that they can't object to an action taken by third parties, they're basically saying that they can collapse their decision to opt out with someone else's decision to replace them. And it's actually especially paradoxical in the context of RFRA, because remember, RFRA itself is a statute that invites people to raise their hands and say, I have a religious objection to doing something. And it would seem that under plaintiff's view, I mean, I don't know if this is their specific religious view, but under their legal interpretation of RFRA, it would follow that if somebody responded, for example, to a RFRA suit by saying, okay, fine, you know, we're not, you know, we can't compel you to do something, so we'll have someone else do it instead, that RFRA itself could pose a RFRA problem. And the fact that RFRA could be turned into such a paradox, I think kind of illustrates how odd it is, how odd this conception of substantial burden is. But closer now, Joe, you mentioned earlier about the objection to contract with an entity that would then provide the service or pay for them. That might be analogous to the workplace situation about the Sabbath. If the law said, fine, you don't have to work on the Sabbath, but you have to go yourself and contract with someone who then will come work on the Sabbath, that would be more of a burden, it seems to me, than simply saying the employer can and will replace you on that day. Well, Judge Smith, I want to make something very clear in case this has gotten confused in the briefs. When you opt out, the regulations do not require that you then go out and find somebody who will do it instead. When you opt out, that's it, you're out. You have no legal obligations. The government then places a legal obligation onto somebody else. Now, for the practical reason that it's the somebody else who's already providing services to your employees or your students, or by the way, the dependents of those employees or students who the plaintiffs don't really want to discuss in their briefs. But the government approaches that company. The government goes to Blue Cross. The government goes to Aetna and says, either you're required to do this, or if you're voluntarily willing to do this, we will pay you. But there's no obligation on the part of plaintiffs to go out and find another company. And just to give a very stark example, once plaintiffs opt out, if, for example, Blue Cross or Aetna were unwilling to provide contraceptive coverage, nonetheless, the plaintiffs have satisfied their legal obligations. They've opted out. That's all it is that they had to do. The government may be imposing an obligation on Blue Cross or Aetna. At that point, if Blue Cross and Aetna didn't want to provide contraceptive coverage, then that would be an issue of their So Judge Smith, I mean, obviously, sometimes things get a little bit lost when you're kind of chasing down these analogies. But rather, the kind of Sabbath example that Your Honor gives is not, if you don't want to work on the Sabbath, you have to find somebody else who will work on the Sabbath. Rather, it's, if you don't want to work on the Sabbath, somebody else who works for this company and already knows the office and is able to do this job, we will have them work on the Sabbath instead. Counsel, thinking about what happens to somebody else. What happens to these employees? They can't get coverage if they work for this employer. Well, I understand that, Judge Weaveley. Judge Weaveley, I think that, as Your Honor's question, friendly question, acknowledges what we think the Supreme Court made clear in Hobby Lobby and made clear in Wheaton College is at the end of the day, it is critical that the women do get the coverage. And so, I mean, what the government has done is created a system like other opt-outs, where in the language of the Supreme Court in Hobby Lobby, the plaintiffs are effectively exempt. This is a system that is meant to respect their religious liberty and allow them to raise their hand and then be done with it. And then it's the government who makes sure or at least does its best to ensure that these women do get the coverage. Now, since I've got the floor, let me put a question to you that counsel on the happily side can respond to if they're interested. What would you like to see the Fifth Circuit do now? You've got four circuits holding one way and you've got, well, why don't we wait to see what Posner does with Notre Dame since he's got that back with a couple of things said by the Supreme Court. Wouldn't it advance things just for us to wait and to see what happens to Notre Dame case? I mean, Judge, really, you don't need to say a lot, but you just respond to that and then they say what they want. Sure. To be honest, I don't have a strong view on that. Obviously, it's entirely within a court's discretion when it wants to issue a decision and how it's going to do so. I should point out that two courts of appeals have ruled for the government after the Hobby Lobby decision, the Sixth Circuit denied on Bonk after the Hobby Lobby decision. And obviously, your honors have heard arguments from both sides about why Hobby Lobby is relevant. But in our view, we think that Hobby Lobby and especially Wheaton College both underscore that these folks are effectively exempt, that all they do have to do is raise their hand, as the Supreme Court said in Hobby Lobby, and as the Supreme Court said in Wheaton College, all they need to do is just kind of take the affirmative act of saying that they want out. And just setting aside the substantial burden analysis, and we do think quite clearly, I mean, in Hobby Lobby, you have a majority of the justices who expressly say that this is a compelling interest. And then you have four justices... Counsel, you keep saying that, but I thought they said we're going to assume that it is. Well, Judge Graves, I'm getting to five by adding the four in the concurring opinion, stressed that this is a compelling interest. And there's actually been a little bit of disagreement in the briefs about exactly what Justice Kennedy said. Obviously, of course, your honor is free to go read Justice Kennedy's opinion. But I do just want to point out, I think we kind of pull all this language together in the reply brief. Justice Kennedy first has this sort of sentence. It's not entirely clear whether he's just observing that the government has argued that it's a compelling interest, or whether he's kind of grabbing onto the government's argument that it's a compelling interest. We obviously read it the paragraph and point out that there are a number of important medical reasons that women need to have easy access to contraceptive coverage. He then says it's important to underscore that a premise of the court's decision, again, an assumption, but a premise of the court's decision is that this is compelling. And then if you skip ahead to the end of his opinion, he describes these accommodations as the way to balance religious liberties with the exact language he used is interest the law deems compelling. So we think we have five justices saying that this is compelling. But even with respect to the court, the majority's assumption that it's compelling, you do then have the majority in the course is that assumption. I mean, quite strikingly, I think it's seven or eight times going out of its way to say, the effect of our decision on affected women is precisely zero, it will have no effect responding to this sentence, they're not going to have to go sign up for a new program. So, you know, regardless of whether they're kind of offering the reasoning for why it is that that this is effective, their decision is precisely zero. And the plaintiff's argument is no, actually, the effect of their decision is a lot bigger than precisely zero. And we're not just assuming that the compelling interest you've identified applies specifically to the plaintiff's employees in this case. That's correct. And, you know, if I could address that argument, I think it's one of the appellee's briefs has kind of made a made a big point that there are, I think, both some legal problems with that analysis, and then actually just some factual problems in this particular case with that case, what we're looking at are thousands of employees, and students and dependents of those employees and students. And essentially, what the plaintiffs have said is they've said, well, our employees, and by the way, this is only some of the plaintiffs, not all the plaintiffs, some of the plaintiffs have said, our employees tend to share our religious views, therefore, there can't be a compelling interest here. Now, just as a legal matter, when the Supreme Court has described the exception, and you have this going back to cases like Yoder, which describes the Amish exception, even though there, I think, was only three families in Yoder. You see this in Sherbert and in Thomas and in Lee. And even after Ripper gets passed, the Supreme Court continues to use that terminology. So in Ocentro, for example, the Supreme Court then refers back to Yoder as being about an Amish exception. And I actually think just as a practical matter, that makes a lot of sense. Because remember that if the plaintiff's argument were right, what it would mean is that in order to have this case at all, the government would need to conduct discovery of thousands of non-parties, the women who work for the plaintiffs, or in fact, the women who just are married to someone who works for the plaintiffs or whose parents work for the plaintiffs, and would have to engage in discovery of things like their religious views, their sexual habits, their health history. And it would be rather startling if that's actually what Ripper requires. But there is actually also just a factual problem with the argument that the plaintiffs make, which is that if you look at the plaintiff's complaints or the declarations that they're pointing to, there are kind of broad statements about religious views. They will say things like, you know, our employees share our view of God or share our view of fellowship. But I don't actually see any specific statements that they share the exact view that they would under no circumstances be willing to use contraception. And even if that did exist in the declarations, remember, the plaintiffs seem to avoid this in their briefs. But it is acknowledged, at least in passing, the record in this case, that these health plans don't just cover employees, they don't just cover students, they also cover dependents. And if you look at I think it's page 19 or 20 of the Institute of Medicine report, it spells out that actually one of the critical reasons for having the women's preventative services coverage requirement is that you have a number of women who get their health coverage as dependents through these kinds of plans. And plaintiffs certainly don't make any attempt to represent the religious views of folks who don't work for them and don't attend their school, but rather are just dependents on the plan. Now, again, Your Honor, all of that is not to say that we're requiring the plaintiffs to provide contraceptive coverage. All that is just to say, as we think the Supreme Court recognized in Hobby Lobby, that the plaintiffs can be effectively exempt, that they can raise their hand, they can say we don't want to provide coverage. And then in response to that, then the government will arrange for someone else to provide coverage instead. Your compelling interest argument is substantially weakened by the large number of exemptions that are built into the law. Exemptions for small employers, for example, and others that we're all well aware of that have nothing to do with any kind of carved out religious objections. So how can the government say that it's compelling and yet Congress consciously included all those exemptions? Well, Your Honor, in the same way that having to or combating discrimination or having people fight in a draft are compelling interests, I think the plaintiffs agree that those are all compelling interests, even though all of those programs are also subject to a number of the same exceptions that the plaintiffs talk about. For example, Title VII, the federal statute that prohibits discrimination on the basis of race and on the basis of gender, currently does not apply to employers with fewer than 25 employees and indeed, as originally passed, didn't apply to employers with fewer than 15 employees. It doesn't therefore follow that there's no compelling interest in combating race discrimination. It just follows, I think the Supreme Court acknowledges this in Hobby Lobby and actually the D.C. Circuit spelled this out quite clearly in Grease for Life, that you can have a compelling interest but nonetheless have other things that you take into account in deciding exactly how you're going to affect that compelling interest. So when the plaintiffs here argue, well, you know, small businesses don't have to provide contraception. First, I should actually point out small businesses are not required to have health coverage generally. But if they do have health coverage, it needs to include contraception. And if they don't have health coverage, then, of course, a woman isn't receiving any kind of health coverage and can go on the exchanges and use her tax credit and buy an entire comprehensive policy. But it doesn't follow that because these small businesses don't have to provide the sort of coverage that we're talking about here, that this isn't a compelling interest any more than it doesn't follow that because small businesses are not subject to Title VII that, therefore, there's no compelling interest in combating discrimination. I mean, I should actually point out, Judge Smith, that we've pointed to extensive empirical evidence in the administrative record, in the Institute of Medicine report, and you have a number of justices in Hobby Lobby who spelled this out in great detail. The D.C. Circuit also cites a fair amount of evidence in its Grease for Life decision as to why it is that these are actually compelling interests. And the plaintiffs, their briefs don't really seem to just to say that because the government doesn't always require that every employer provide contraceptive coverage, that, therefore, the government can't think it's compelling. And so I think, then, the inquiry really is just ask yourself, well, why is it that the government in a particular situation is not requiring coverage? And obviously, we have traditionally recognized that small businesses are given a kind of certain degree of extra liberty and freedom that they don't have to do certain things that other businesses do, like comply with Title VII. And that's the reason, then, that the government doesn't require them to provide contraceptive coverage. And I know that the plaintiffs have made a number of similar arguments, for example, with respect to the way that churches are treated, a category that has always been treated differently, has always and traditionally been given almost a kind of sphere of autonomy in the law. You see this most notably in the tax code. I mean, the exemption for churches here just cross-references a tax code provision. Social Security as well. I don't know the exact details of how churches are covered by Social Security, but yes, that may be right. So again, the fact that these folks aren't covered doesn't show that this is not a compelling interest. And the plaintiffs don't actually rebut the actual scientific arguments and evidence, which five justices in the Supreme Court accepted and four assumed to be the case as to why this is a compelling interest. Unless the Court has any other questions, I'm happy to save my remaining time for rebuttal. Yes, you've saved time for rebuttal. Thank you. Thank you, Your Honor. Mr. Allen. Thank you, Your Honor. Good morning, and may it please the Court. Thomas Allen with Jones Day on behalf of Appalese University of Dallas, Catholic Charities of Fort Worth, Catholic Diocese of Beaumont, and Catholic Charities of Southeast Texas. Before I begin, I'd like to thank the Court for the additional time for argument this morning. It makes it easier to share things with a group of lawyers, so we do appreciate the Court's indulgence. This case is not about denying health care to women. It is not about trying to dismantle the Affordable Care Act or otherwise opt out of democracy. Instead, it is about the government trying to force a religious group to do something that it sincerely believes is wrong. But when it passed RFRA, Congress said the government can't do that. All right, you used the phrase of do something. What is that something that your clients are being required to do? We're being required to do two things, Your Honor. The government touched on it, but I agree with your initial question that they are misstating our objection a bit. We're required to do two things. We're required to submit the offensive objectionable document, and second, we're required to maintain a relationship with a company that will provide contraception coverage for our beneficiaries. Both of these acts that we're required to do, these affirmative acts we're required to take, cast us as an essential cog in the government's machine. Well, describe for us what you just called the offensive document and explain why that's requiring you to do something that's offensive to your client's religious views. Certainly, Your Honor. There are two documents. There's the self-certification form, and then there's the subsequent revised accommodation that we would send to the Secretary of HHS. Under both cases, under the self-certification form, we would complete this form and send a copy to our insurance company or our third-party provider. That would notify them of their obligation to provide this coverage, and then in the case of a third-party administrator, after they provide the coverage, they could seek reimbursement from the government. What's most important, I think, to remember about this is the government says that our employees or beneficiaries won't get the coverage without our involvement, that we are a necessary step. We may not be the sufficient cause, as Judge Rosenthal pointed out, but we are a necessary step. It may say that it won't happen unless we are involved, and that is the nature of our religious objection here. You're not through with the statement, but you said we're continuing the relationship. I don't understand that. Yes, Your Honor. Independent of the specific mechanism of sending this letter, the beneficiaries will only get the coverage at issue so long as they remain part of our plan. Our plan is the vehicle that gets them this coverage, even though we don't pay for it and in our religious judgment, that's too close. That brings us too close to conduct that we find irredeemably sinful. I thought it was interesting that when the government spoke, Mr. Jed used the term practical considerations. He offered you practical considerations, but when speaking about substantial burden, he never said religious considerations, and he sort of was collapsing the substantial burden analysis on the strict scrutiny analysis. Substantial burden, for all the sort of sound and fury that surrounded it, asks two very straightforward questions. One, does the government require us to do something to take an act or refrain from taking an action that conflicts with our sincerely held beliefs? And if we refuse, do we face substantial coercion to comply or substantial penalties? If the answer to both these questions is yes, substantial burden is satisfied, and under Hobby Lobby and the Thomas case, which I believe is very significant and relevant here, that test is met. The government doesn't dispute the sincerity of our beliefs. It doesn't dispute the substantiality of the pressure we face to violate those beliefs. So the only question for this court is whether the regulations force us to do something that we sincerely believe is wrong. I want to be clear. So that's your proposed test. If the government requires you to do something that you sincerely believe to be wrong, that's the test for determining whether or not it poses a substantial burden. That's the first part of the test, Your Honor. The second part of the test has to do with the substantiality of the coercion that we face to violate those beliefs. So here, the substantiality issue is really not in dispute. We face the same penalties and same fines that were at issue in Hobby Lobby. The Supreme Court found those to be substantial. Those penalties, that's another lawsuit. That's no compulsion. That's out of it. How would you like me to respond? If we reverse this injunction, we're not going to subject you to any penalty. The government plan now under the regulation. I think the penalty, that is another matter entirely. Well, Your Honor, I believe that we remain subject to these penalties. If the injunctions are lifted, we will still face penalties if we do not submit the forms or if we drop our coverage. Even if someone in authority, this entity, this diocese is exempt, but the government simply states to the government the objection, the religious objection, that is a substantial burden? No, Your Honor. Simply objecting and then having no further involvement is something that I don't believe would rise to the same level of the religious objection we have here. The government tries to mischaracterize our objection and say that's what this is, but it's not because we remain. Judge Rosenthal was looking and decided it on the act, doing something, rather than a third party doing something. Yes, Your Honor. So what is it you do that is a substantial burden? Declaring your faith? Not at all, Your Honor. Telling the government you're against birth control? Not at all, Your Honor. What is it? It is remaining, to repeat the phrase I used before, remaining a necessary cog in the government's machine that ultimately delivers products and services that we religiously object to. You have nothing at all to do with whether the insurer pays a bill. You have no cost at all. I don't know what this relationship is. Well, I think the Thomas case is instructive regarding this. The Thomas case, as you recall, involved a Jehovah's Witness who had been employed in a factory where they made sheet metal, and he was fine making sheet metal even though it might one day be used to create weapons. That factory closed and he was transferred to a factory where he'd have to work on the turrets for a military tank, and he decided, as a religious matter, that got him too close to being involved in creating armaments. And the state there, in denying him benefits, didn't understand that distinction. What's the big deal? In other words, you were happy to work on this rolled sheet. Why won't you work on these turrets? And the Supreme Court flatly rejected that and said, no, those are fundamentally religious judgments that the objector is entitled to make. And once he draws that line, no one, not this court, not the government, no one made second guess, as long as those beliefs are sincere and religious in nature, and as long as the objector faces a substantial coercion to violate them. But Counselor, it just sounds like what you're saying is as long as you believe it poses a substantial burden, then that's sufficient for us to conclude that it does. Well, I don't think that's quite what I was saying, Your Honor. I would suggest that it is, again, this two-part step where we identify our sincere religious belief that taking some action or forbearing from some action, but here it's affirmatively taking action, is wrong. And then if we don't do it, if we don't do what the government tries to make us do, we will be condemned. Your sincere religious belief is that contraception or birth control is wrong? It's more than that, Your Honor. Our sincere belief is that those things are wrong. And so you don't want to do anything that facilitates that, that causes it to happen? That's correct, Your Honor. In other words, just like in Thomas, we're talking about degrees of insulation for its purposes. But that doesn't take into account what our religious view of the nature of those insulations is. In Thomas, it wasn't good enough that he was just working in a factory. He didn't know what would happen to those tanks. They might go to the battlefield, they might go to a museum. But he made the religious judgment that that was too close. He was entangled in something that he found to be religiously intolerable. That's what we're saying here. We are compelled to stay too close. And we say, as a religious matter, that that's not something that we can do. And so if we don't do it, we're subject to these enormous fines. Counsel, you're not making birth control pills or any devices. You're not making them. I mean, I understand what you're saying about that case, but you'll agree with me this is a little different, won't you? Of course, every case is different, Your Honor. And so you're right, we are not directly paying for, we are certainly not manufacturing birth control. But in our judgment as a religious matter, as a Catholic doctrine of complicity with evil, when we remain even indirectly involved in the provision of these products and services, that amounts to a sin. And that is the kind of fundamentally religious judgment that objectors just like Thomas are entitled to make. So this is not like, I'd like to mention, this is not the same as us merely objecting to the actions of third parties. The government cites cases like Bowen and Kimmerling. But in those cases, the plaintiff truly wasn't doing anything. The government already had the tissue sample. And the objection was what the government was going to do with that. They were going to extract DNA. And the court said, well, essentially too late. But you're not having to do anything. In Bowen, the government already had the child's social security number, so the parents couldn't object to what the government was doing with what it already had. Interestingly, in Bowen, five justices suggested that it would be a different situation if the parents had to actually submit the form with the number on it. So there is a real distinction. Those plaintiffs didn't have to do anything. Here, we do have to do something. Is it fair to say that all of the circuits that have addressed the issue have said that substantial burden is something that the court decides rather than accepting the plaintiff's view of what they consider to be a substantial burden? I think that it's been characterized in that way. Substantial burden is a mixed question of fact and law. Many of the facts here are not in dispute. No one has questioned the sincerity of our belief. No one has questioned the fines. The government has never questioned the fines that we have to pay. We have stated that this is our sincere religious belief. And under Hobby Lobby, that satisfies the substantial burden test. In the time I have about strict scrutiny, this was the government's burden. This was the government's burden to provide evidence to meet a very difficult test. It must be applied to the person who is seeking an exemption. But in the courts below, the government wholly failed to meet this burden. With regard to compelling interest, it's not simply free-floating policy preferences, however laudable they might be. But it must be focused to us. In other words, what is the government's compelling interest in not exempting us? And Judge Smith, as you pointed out, that argument is severely weakened by the exemptions, most clearly the religious employer exemption. The religious employers, which are churches and dioceses, are completely exempt and don't have to take the affirmative steps we have to take. Just as in the Ocentro case, where they were talking about peyote, which was exempt, but another very similar drug that was exempt. Everything that the government says about us could be said about these religious employers. And the only evidence they have mentioned to justify the distinction they draw is the intuition, the supposition in the Federal Register, and even in the trial court in Beaumont, they said it was just reasonable to assume that the employees of the religious nonprofits were less religious than in churches. But that's not evidence, and if that supports strict scrutiny, I don't know what does. I see I'm out of time. If the Court has any other questions, I'm happy to answer. Otherwise, for these reasons stated here and in our brief, I respectfully pray that the Court affirm the rulings of the courts below. Thank you. Thank you, Mr. Allen. Mr. Wynn? May it please the Court. I would far prefer to have made it through the rest of my life without disagreeing with Judge Reveley, but with great respect at this moment, I think I enforced to do that. Your Honor, Mr. Wynn, you know it's open. Your Honor, all of your honors, the penalties that will destroy my client if it fails to comply with these regulations are this case. The very injunction that you addressed is an injunction against the infliction, the imposition of those very destructive, obliterating, really, for my client penalties. That is this case. That is not another case. Now, in terms, Judge Graves, of your inquiry about the consistency of the inquiry of substantial burden that is addressed in Thomas and that is quoted in Hobby Lobby, the issue is not the degree of offense to religious faith. That is a category into which the Court, Thomas and Hobby Lobby, said courts are not to inquire. The substantive burden attaches to the threat of the imposition of the sanctions if you take the action that is, according to your sincere conviction, a violation of your faith. So it's not the degree of violation of your faith that constitutes substantial burden. There has to be a sincere sense of violation of your faith, but the burden consists and the inquiry for the courts consists in what's the degree of threat of what's going to happen to you if you refuse to act inconsistently with your religious faith. Now, a way to illustrate that is how dimensionally different the government's argument is before this court than it was the district court. Before the district court, the argument on substantial burden was the role of my client in sending the notice, the connection between my client sending the notice under the accommodation and its opposition to supporting abortion was too, quote, attenuated. It was too distant. You haven't heard the word attenuated out of the council, very capable council this morning. You don't see it in their brief before this court. What you see is the word opt out. We've now changed from attenuated in the government's opt out. So the reason they've made that change is because of just what I referred to in Hobby Lobby quoting from Thomas. It's not the province. It is not the province of the courts to inquire into the degree of religious offense that a government act causes. In this instance, the Affordable Care Act and the regulations. The only issue is how burdensome is the threat to the religious objector if he does not take the action that's required. So the attenuated argument has been rejected explicitly by the United States Supreme Court. So the government had to come up with something new since Hobby Lobby, really since Thomas, but reiterated, reinforced in this context in Hobby Lobby. So what did they come up with? They went and augmented. So where would we be in this case if the penalty were $1 per employee per year? Well, would you be making the same argument? I think what I would say to that, Your Honor, is I don't know where I'd put it at a dollar. I think that that's the inquiry for the court. The Supreme Court has said the degree of threat if you don't comply, that is the penalties, the degree of burden of the penalties is the appropriate category of inquiry for the courts. Not the sense of degree of offense of taking the act offending religious faith. That's the distinction. So would a dollar do it? I mean, my quick call would be even for Westminster, a dollar wouldn't do it. But, and I don't remember all the numbers, but I can assure you we've laid out all of the... We know that it's a draconian penalty under the law, but I just wonder how your argument follows through if it's a smaller penalty. I would submit that's a line for the court to draw. In this case, it's undisputed. In this case, there's no need to inquire into it. Mr. Wynn, would you just do me a favor and restate what your legal test is for determining whether or not there's a substantial burden on the religious exercise under RFRA? Is there any degree of offense to religious faith in being required to take an act which, if you do not take it, will rain down on your head substantial penalties? Some degree, however attenuated, of offense to religious faith, that if you don't take that required act, is going to rain down the wrath of the government in this instance, devastating, draconian financial penalties. And the inquiry for the court, once the sincerity of the religious offense is established, and in here it's undisputed, then the court's inquiry is, are these penalties substantial if Westminster doesn't send that notice in? That's the test, and that's the part of the inquiry that the court has, and so this case is if Westminster wasn't forced to comply. Well, look, Westminster believes in complying with the law, no matter what the penalties are, but that's all I want to speculate, that it would just go willy-nilly, violate the law if it could do so with impunity. Probably would, but that's not this case. This case is Westminster lives or dies on whether it acts in compliance with the government's requirement under these regulations or not. It dies. It refuses to comply, and that's exactly what RFRA is about. It's a government act, a statute, and regulations that require compliance, require an act to be taken by Westminster, required in order to comply. So sending in the form claiming the exemption is what you're terming an offense to religious faith. Exactly right. That is the required act. That is the compelled act. That is the act, well, it's all in the alternative. They could include these offensive drugs and devices in the plan that they provide for their employees, but we're talking about the accommodation. So under the accommodation, the alternative act that will constitute compliance, it is sending in the notice. Now, here's where the government breaks down in this opt-out. Remember, it shifted from attenuated. That's gone under Thomas and Hobby Lobby, and now they're into an argument of opt-out. Well, what's an opt-out? An opt-out would be equivalent to exemption. You're free. I'd say the Supreme Court in Wheaton has made it mighty easy. If the government learns that you've got birth control objection, that's about all it took to the dean or the president to sign anything. Well, your honor, I'm not sure that I'm following your observation. Well, let me say that Westminster does not... They granted a writ over Sotomayor's dissent. They granted a writ and sent it back to Judge Posner to reconsider, but it didn't take much of an act by Wheaton. Correct, and here's the separation between what the Supreme Court said in Wheaton and the government's position now. In light of those actions by the Supreme Court, the government went in and augmented the accommodation rule. The augmentation still requires compliance, not an exemption. The way to meet the augmented rule is Westminster no longer has to send its notice to its third-party administrator. It has the prerogative to send it to the Department of Health and Human Services. Here's the critical difference. In the order in Wheaton, the Supreme Court said the government can do whatever it wants to. Under the augmented regulation that is still in force against Westminster, the effect will not be to let the government do what it wants to do. The regulation then imposes and provides for the government will then, not may, not may think about, may not have the option, but will send that notice to Westminster's third-party administrator and will remind and impose on that third-party administrator the obligation to provide this. So all the augmentation has done is add one step on the notice's journey from Westminster to the third-party administrator that it must provide this coverage. That's radically different from what the Supreme Court's order said in Wheaton College, Your Honor. Mr. Wynne, you are a very effective advocate. I don't have much judicial authority. Westminster is not going to be paying $2,000 a year for your employees, I can assure you. It can't. But the imposition is there, the enforcement is there, and the only way we can be protected from having to pay it is in your hands, Your Honor. Judge Wynne said I don't have to worry about it. And I hope you put that in the opinion. Thank you all very much. Thank you, Mr. Wynne. Mr. Rosbach? Good morning, and may it please the Court. Eric Rosbach, representing East Texas Baptist University and Houston Baptist University, which are two Baptist institutions that are controlled or affiliated with the Baptist General Convention of Texas. So I just wanted to respond to a couple of things that Mr. Judd said. One is that he keeps making this conscientious objection analogy, but there's a problem with that, is that all of his cases are about individuals, and we're talking about institutions here. And it's a lot harder for, say, a Catholic hospital to say, okay, we're just going to outsource our government-mandated abortion practice to somebody else. They can't just, they're an institution, they're not just raising their hand, they're saying we have to go and arrange it for someone else. So I think there's a real problem there, because these are religious groups, and it's engaging collective religious right rather than an individual one. And certain religious freedoms are collective in that way, like, for example, the ministerial exception, which this Court developed and the Supreme Court later adopted in the Hosanna Tabor case. And it causes all kinds of issues. If you think about, for example, like some of the sanctuary cases involving immigrant churches that believe that they need to provide sanctuary to immigrants, it doesn't do the religious claims in those cases. And you can look at Presbyterian Church against the United States for an example of one of these sanctuary cases. It doesn't do them any good to say, oh, well, we'll just have somebody else, we'll arrange for someone else to report on these immigrants and not let them in. Or divestment. A lot of religious denominations are considering right now whether to divest from energy stocks, because they're viewed as immoral. And they can't, the government can't then come in, let's say Texas passes a rule and says, well, you don't have to do it, but your broker will go and buy these stocks for you, because we don't want to have discrimination against energy stocks in government, in anyone's portfolio. That's the kind of thing that he's asking for here. It's not about individual conscientious objections, it's about collective. The second thing that he said that actually is not true is that we don't have to go out and find a company. If you look at the interim final rule, 26 CFR, section 54.9815-2713AT, sorry to have to enter that into the record, that does require us to go out and get a third-party administrator. So both of my clients have our self-insured plans, but they can't do it in-house. So they can't do that in-house. The government's requiring them to go out and have a different entity administering this plan. So that was just not a true statement by Mr. Jett. On this other point about commandeering, I think it's really important to realize that everything about what the government's doing is sort of like a parasite or a leech on top of our plan. So the second that an employee is no longer on our regular plan, they're not going to be under their so-called accommodation. It's something that gets done through there. And they even say it has to be seamless. So the whole point is we're going to force you to do it sort of grafted directly on there, grafted so much that you don't even see a seam between the two things. So that's what the commandeering point is about. There's also an issue with the trigger, the catalyst, vital cog, linchpin, whatever you want to call it. So there's two separate things. One is they get to hijack our plan. That's what they want to do under the accommodation. The second is that they want to use us as the catalyst for that. And there's a problem because they're taking what the Supreme Court did in Little Sisters of the Poor and in Wheaton, and they're packaging it with an authorization. And the reason they need to do that is because they don't have power under ERISA to just sort of force this regulation into our self-insured plans. They need us. They need us to sign off on it. So that's why it's different than what the Supreme Court did in Wheaton. And Mr. Jed says repeatedly, oh, they said that the government could rely on this notice. But remember, in Wheaton, the court's calling the government, called the government's bluff. You have to read this paragraph that starts, nothing in this interim order affects. That's when the court is saying, look, the government says we don't need the form to do this. So we're just going to take you at your word. You said you told us in this court, the Solicitor General went to the United States Supreme Court and said, you don't need to do this. And that's why it has this stuff government contends, the applicant contends. And then at the end it says nothing in this order precludes the government from relying on this notice. So it's just saying, you know, we're not stopping you from using this notice however you want to do, just as you represented this court. So it does take a little bit of, you know, chutzpah on Mr. Jed's part to say, oh, you know, we're, you know, this actually really helps us. I mean, you know, they lost Little Sisters of the Poor, they lost Hobby Lobby, they lost Wheaton, but somehow magically each time it actually, you know, supposedly supports their thinking about these cases, because Mr. Jed was very vociferously opposing that GVR. Well, I disagree with your take on the GVR, and I read the letters that were submitted on that. GVR is not an indication of the merits. The Supreme Court sends back cases that ultimately are changed after GVR and cases that are not. You're putting way too much weight on that. I don't blame you as an advocate for trying to argue that, but we're not going to take that GVR as meaning that it's a tantamount to some kind of ruling on the merits. Well, then I won't talk about it anymore. On the, you know, going to Judge Riebley's question about, you know, whether the women dependents or women employees are going to get coverage, we said, we pointed out in our briefing that they can use the existing Title X system. They could issue a guideline via blog post, which they have done with some of the eight changes that they've made to this rule thus far. Every time they lose, you know, lose one of these cases, they back up another five inches, and so what we said that they could use Title X, that's an existing program, and they don't deny that in their briefs. They don't say that they can't use Title X. They just don't want to use Title X, so they actually wouldn't have to have that. They just, they're not responding on that point. On substantial burden, I think it's really important to think about the substantial burden test, part of the test. Remember, the plaintiff's case is substantial burden on one side, and on a sincere religious exercise on the other side. The substantial burden part is about what the government's doing, so it's what is, you know, Damocles over someone's head, or are they hanging a ping pong ball with Damocles over someone's head? If it's the sort of Damocles, that's a substantial burden, but that could be a, that's an objective test. Is that going to dissuade someone from doing anything? Let's say you had a, you know, millions of dollars of fines for playing basketball. That's going to be a substantial burden on playing basketball, so the court doesn't have to get mixed up. You know, what's the religious exercise, and what's the substantial burden, but the substantial burden is not about how the plaintiff feels. It's about how the, what the government is doing, and that's an objective test. That's up to the courts to determine as an objective test, right? Exactly. It's not part of your assertion of core beliefs, which is a different issue. Right. I think it's very important to keep those two things analytically distinct, so there's sort of the, you know, what's the, what is going to drop on our heads if we don't, if, you know, if we engage in our religious exercise, but it's important not to mix the two together. And so it's not how onerous the act is that the government is requiring you to do. It's what happens to you if you just don't do it. So if the government said, all I need you to do is turn on a light switch every day in a room in the building where you're coming in every day, hit that switch every day when you come in. Yes, we do too much. Right. I'm coming in, I don't want to turn on the light. So that's onerous. I'm not sure I 100% followed. If you don't do it, then you got to pay $400 gazillion dollars. Right. So it's not the act that I look at to determine whether or not it's some substantial burden. What I look at is what happens to you if you refuse to perform. And that's exactly right, because think about the conscience of a judge or somebody, a government official or someone that has to sign a death warrant. It's the same thing. You sign the piece of paper. It's just a little thing, but that could have a huge conscientious effect on that person. So I agree with you 100%. That's the religious exercise part. And that's where there has to be some deference under Thomas. On the substantial burden part, it's an objective test. And if you look at... Your argument is signing that little piece of paper interferes with the free exercise of your religion. That's onerous. That's a substantial burden, not because signing the death warrants, but because of what may happen to you if you don't. Because the weight's going to drop on our head. Yeah, that's right. There's a consequence for what we... If we don't sign the form, then we're going to get that. Or if we don't maintain... If we don't go out and hire the third-party administrator... If it doesn't really hurt, why wouldn't you sign it? What's that? If it doesn't really hurt, why wouldn't you sign it? Well, then that's a situation where you don't have a substantial burden. And courts have found this, for example, in religious land use cases, that if you go and say, well, I'm a religious entity. I don't want to even go through the environmental permitting process in the state of California. The courts have said, no. If you look at a case called San Jose Christian College against the city of Morgan Hill, that's a case where the Christian College said, well, we don't want to go through this whole environmental impact process in California. That's really hard. And the court said, no, that's not a substantial burden because it's something that doesn't dissuade everyone from doing it. And in this case, it's obviously very easy because if you look at Hobby Lobby, that's what they do. They divide it up into different parts. You have what's the religious exercise, then what is the government doing in response to that? So it's not about what the plaintiff is feeling in his head or in his heart. It's about what the government is doing. And that's why it's an objective test, and you can think about it. Another case that's Navajo Nation, which is an en banc Ninth Circuit case written by Judge Baya, 535 F3rd 1058, that also talks about, basically found no substantial burden because it wasn't about what was, the claims were all about subjective feelings that the plaintiffs had as opposed to some sort of legal or otherwise objectively ascertainable burden. So that's that point. You know, you never heard the words to the person come out of Mr. Jed's mouth. That's for good reason. To the person is the standard under RFRA, and it actually cabins what RFRA does. RFRA creates exemptions in specific little places. It doesn't, you don't strike down statutes using RFRA. All you do is make little carve-outs for specific plaintiffs. And, you know, Mr. Jed wants to win this case wholesale. He wants to say, I want to, you know, I want a rule that applies to everybody. But the whole idea of RFRA is that it forces the government to make tiny exceptions for the few people that will complain about a particular rule. And so that's why Ocentro says this best, you know. And it says at the end, this is not an easy task that it's given to the government, or to the courts rather, because the courts have to look at these cases case by case. So I'm not sitting here envying your honors about that. But that is, but the court, the Supreme Court did say that that's a burden that's on the courts. You have to address them case by case. What do you, what do you do with the other circuits that have dealt with similar cases? Where did they go wrong in your view? Well, their errors are legion. You know, the, I think that, you know, the Geneva College case, where they just denied en banc yesterday, and Mr. Jed filed a 28-J about that. You know, look at that opinion. They're sitting there deciding what is complicit or not. I mean, that's not, that's not the job we want courts to do. We don't want courts going around deciding, you know, who's, who's morally complicit or not. You know, it's, you know, from a, from a religious point of view. And, you know, over, you know, just word search that opinion for the word complicit. And it's just, it's kind of disturbing how much power they are irrigating to themselves in that, in that decision. I think the other thing is that Peace for Life is currently en banc. It's been waiting on en banc decision for a while. And then, you know, the other cases are sort of disappearing. So you have Notre Dame used to be there. You know, as we pointed out, they relied on it very heavily. Now it's gone. Now they're asking the Supreme Court to GVR Michigan Catholic. So I think that on the basis of Notre Dame. So I think that there's, you know, these cases are kind of getting vacated and disappearing. And part of it is that every time that the government has a fight in front of the Supreme Court about one of them, Little Sisters, Hobby Lobby, Wheaton, and now Notre Dame, every time there's a, the battle is met, they're losing. The, so one other point I wanted to address was just the, the point about the, just the weirdness of treating churches differently than religious universities. So here you have, you know, an entity, for example, ETBU is, is controlled by the Baptist General Convention of Texas. You know, the board is, is controlled by the Baptist General Convention. The Baptist General Convention gets a total exemption, doesn't have to do a thing. You know, Mr. J keeps talking about, well, just raise your hand, just raise your hand. Well, they didn't say, just raise your hand to the, on the religious exemption. And so it's just very strange that this entity that's really part of the Baptist faith in, in, in Texas is being forced to do something that, and, and be involved itself, go out and hire a third party administrator under the interim rule and, and, and have to then, you know, go ahead and, and, you know, do something completely different and something that's really forbidden by, by their denomination. There's a real problem there. And a lot of denominations, different denominations have different polities, but they often have entities that are involved with them, be they hospitals or colleges. You want to not have to do anything. Well, since the government's already shown that that works for the churches, and I don't think Mr. J will come up and disagree. Sure. That would be the easiest way to deal with this. I think that if, if we get another rule from the Supreme Court, that's kind of in between that, then how would the government determine who doesn't have to do anything? Oh, I think it'd be very easy. Just, it's a religious nonprofit corporation. It does that all the time with, for example, you know, religious entities. Would you be willing to make that declaration somewhere on the form? I don't, I don't think we have an, we don't have an objection to doing information. The problem is the packaging, right? So we don't have a, you know, Little Sisters of the Poor didn't have a problem with saying we have an objection, right? They didn't have a problem sending that email, which is how that was done. It was an email sent to opposing counsel. So let's do it this way. Your remedy is you do nothing. What would you have the government do to determine who gets to do nothing and still not have to pay for or be involved in contraceptives, abortion, any of that? How does the government make that determination for these entities who want the benefit of not paying for that, but they want to do nothing? If you look at the, if you look at the rules, they have a difference between what they call a religious organization and an eligible organization and just have the same rule apply to the eligible organizations. We count as eligible organizations under the way that they've written it out. Now, I want to be very clear. I'm not saying that, that, that, that's the only way this court can rule and it has to say that there's an exemption, right? This is up on as a partial final judgment. So we still have our other claims live in Judge Rosenthal's court, should this case be remanded on that basis. But, but, but, you know, so we'd be happy to enjoy that injunction, continue to enjoy having that injunction to protect us. So I'm not sitting here asking the court to re, you know, rewrite it, but it could, it could do that. The court could say, look, the best way to deal with this is just give the exemption that they've already given to the churches. So counsel, in all of these briefs and argument, I can't help but wonder, where, what about the employees of these Texas Baptist? What about the employees of the Theological Seminary? What about them? Well, Your Honor, I don't think that we're, you know, that, that goes to the Title 10 point. That is, I, I think that they could provide that. And I, I don't think the government is staying up awake at night wondering about the employees of, you know, the diocese of Houston, the Archdiocese of Houston, right? Well, well, you may be, but the government isn't. So why, why is that? There's something strange going on there if the government says that the exemption's totally fine, and we're just going to leave all those employees out there, but we really care about it with these eligible organizations. That's the kind of thing that something else is going on here. Something else is driving what the government's doing, and I think it's really that they, they, they want to involve these organizations. So like the Lukumi, the Lukumi case that Justice Kennedy wrote in 1993, you know, there's something weird when you allow all kinds of animal killing, but you didn't, you know, but you're going to ban it if it's Santeria. That's the same thing that this court decided in the Merced against Katzen case. You know, the, the Santeria priests wanted to kill goats, and that was a case that we argued to this court, and the court said, you know, there's all kinds of animal killing going on in Euless, Texas, so what's the problem with religious animal killing? So I guess just at the end, there's, this, this whole dispute is actually kind of unnecessary, Judge Rieble. I really think that, you know, the government ought to do the right thing is provide the exemption that they could have done at the beginning, and they just, they're refusing to do that. Thank you. Thank you, Mr. Wynn, Mr., excuse me, Mr. Rosbach, Mr. Jed, you saved time for the bottle. Thank you, Your Honors. There are. I'd like you to go ahead and address, if you would, this, this argument that, that when we view substantial burden, that we look at the threat of the, what I'm sure you can see is quite onerous, if not draconian fines, rather than on the burden of, of filling out a form or undergoing other administrative requirements. Sure. Remember that when an individual is subject to regulation, they're, they have different choices, and so as I think sort of Judge Graves' question was getting to, if you ask someone to flip a light switch, and I think plaintiffs agree, they didn't have an objection to flipping, the mere fact that there might be a huge fine if they didn't flip the light switch doesn't matter, because, you know, the thing that they're doing, flipping the light switch does not constitute a substantial burden. So here, it's true. If the plaintiffs decide to break the law, much as in the same way as if you don't register for the draft, but also are not a contradictory subjector, if you don't say you don't want to work on Saturday and also don't show up to work on Saturday, then you may get into trouble. But the question is not just, you know, kind of how much trouble will you get into? I mean, I actually think the plaintiff's position is a little bit odd there, because then it would force courts to sort of start drawing a line between $1, $2, $3, and actually some of the classic substantial burden cases like Yoder, for example, the fine there was fairly low. I think it was about $50 per family. Rather, what you have to do is look at the act that the plaintiffs want to take, and I think the question for the substantial burden analysis then is just, well, how does a court decide what kind of act counts as a substantial burden? And it's interesting, because I think I stood up here initially and I said, look, plaintiff's position is fairly limitless. It seems to lead to the draft problem and the Sabbath problem. And the last sort of 45 minutes of argument that you've heard from the various plaintiffs' counsel has tried to take kind of different approaches to addressing that that all kind of contradict themselves. I mean, on the one hand, to the extent that the plaintiffs stand up here and really do say, you know, all we need to do is just point to any act, even if it's the act of opting out, and that's it. That's the end of the story. Then they really are saying that the conscientious objector can object to being a conscientious objector, that someone not only doesn't have to work on a Saturday, but also can say, I'm not going to tell you I'm not going to work on a Saturday, and you can't even rely on the fact that I didn't show up to have somebody else work on a Saturday instead. Elsewhere, the plaintiffs seem to say, well, okay, maybe it's true that that will end up being a substantial burden, but then they just say all of those will satisfy RFRA's compelling interest test. It's actually interesting, though, because all of the reasons that the plaintiffs give for why it is that they think those examples would satisfy the compelling interest test contradict their compelling interest arguments here, because when they say, for example, well, draft, that'll easily satisfy compelling interest, but the draft is something that actually the majority of Americans are not required to register for, and here they're saying, well, you have so many exceptions, a lot of people aren't covered, therefore it means that you can't possibly have a compelling interest. And then we got, I think it was from Mr. Rasback, an entirely new argument that actually hadn't appeared in the briefs, but I'm happy to discuss here, where he said that their position is not limitless because all of the government's examples deal with individuals rather than groups. Now, this is quite novel to me that groups, I guess, have some kind of a greater or different religious right than individuals do, but it's also easily dealt with, because obviously all of the same examples that I offered at the court about how limitless their opt-out position is could just be transformed into groups, right? You could have a contractor who post-hobby lobby is not going to perform services on Saturday, and so the government who maybe contracts out to that contractor could say, okay, fine, well, then we're going to have a different contractor fill in for you on Saturday, but sure enough, under the plaintiff's view, that would be turned into an opt-out. So I want to then discuss exactly what the substantial burden that plaintiffs are pointing to is beyond this kind of potential threat of a fine. Mr. Rasback ended his argument by introducing also kind of a new point that I think wasn't really in his briefs where he said, well, really, he thinks this is kind of a religious gerrymander, and he pointed to the Supreme Court's Lukumi case, suggesting that maybe the government is somehow out to get religious organizations. I just want to flag that Lukumi was a First Amendment free exercise clause case, not a Religious Freedom Restoration Act case. Some of the plaintiffs here have made those target religion argument, but that's not an argument that they've raised before this court as an alternate ground for affirmance. I mean, it's also just false. If you just look at the legislative history and the regulatory history, there's no evidence that the government was trying to target religion, but I do just want to point out that the argument that Mr. Rasback ends up falling back on when he's up here is one that is not before this court. It's still before the district courts. None of the plaintiffs raised that as an alternate ground for affirmance. So then look at the actual acts that the plaintiffs say constitute substantial burden, because I think I saw basically two of them while they were standing up here. The first is this kind of trigger opt-out, sending a form to Blue Cross, sending a letter to HHS, an act that they agree, they say, well, in and of itself, we're more than happy to say that we have a religious objection and to declare the fact that we're legally allowed not to provide contraceptive coverage. And in fact, they want to say that to the government. That's obviously what they're doing in this litigation. And they want to say that to Blue Cross, right? Because obviously, Blue Cross ordinarily does include contraceptive coverage in the insurance policy. In fact, Blue Cross separately is legally required to do that. So the plaintiffs have to go to Blue Cross and say, no, no, we were entitled to have that pulled out of our policy, take it out of our policy. So the plaintiffs then essentially just try to say that this is exactly like Thomas, that Judge Graves, they get to collapse substantial burden and religious view that they can have a sincerely held objection and then also say that their view is that that is a substantial burden. That's just the end of the story. And this case really is just the opposite of Thomas. I mean, in Thomas, the court stressed that he was looking for an opt out and he couldn't get an opt out. And the plaintiffs are right that a court cannot engage in second guessing a plaintiff's religious view, but that's not what anyone is doing here. The government is not arguing that plaintiffs really don't believe in this. So this isn't really part of the religion. The government is just making the argument that as a question of law, this is not the kind of burden, the language that Congress used was a substantial burden that then triggers RIFRA's compelling interest analysis. And I think the Sixth Circuit actually summed this up nicely in their opinion, where they said that if after a plaintiff opts out of providing contraceptive coverage, their students or employees get coverage, that will happen despite, not because of, the fact that plaintiffs opted out. And that really does show, I mean, an opt out really is just different in kind from, you know, whether you're going to make the tank turret itself or whether you're going to make the steel that's put into the tank turret. I mean, an opt out is entirely different. You are fully removing yourself. And their only trigger argument, I'll talk about their separate kind of having a relationship with the insurance company argument, but their only trigger argument is essentially just complaining that the government doesn't have a single payer healthcare system. They're just saying, well, the government's going to step in and provide coverage only if we don't provide coverage. And I mean, the fact that the logical conclusion of that, I mean, setting aside plaintiffs' actual religious beliefs, but if folks, sort of many folks made that argument, the logical result of it is to have a single payer healthcare system. It would be surprising if that was actually required by RFRA. How do you respond to the Title X argument? Sure. So the plaintiffs offer the Title X alternative. There are two problems with that. The first is, I think actually, as the University of Dallas brief acknowledges on page 50, but I think Mr. Rosbach did not acknowledge in his briefer up here, is that the government would have legal authority to do this under Title X. Title X is a statutory matter. One, provides coverage through clinics, and two, has an income requirement. By regulation, the government can kind of adjust exactly what the thresholds for the income requirement are, but as a statutory matter, I think it's 42 U.S.C. 300-A-4C. There is preference that has to be given to poor people. So Title X, just, I mean, as the system is set up by law, would provide coverage through clinics and would have to preference people who are poor, so it's just not a system that as a matter of law could do what the plaintiffs are talking about. But second of all, even if the government did have the statutory authority to do that, then the government would be left with the same thing that the Supreme Court disclaimed in Hobby Lobby, which is that women would then be forced to go sign up for an entirely new government program simply to provide for their contraception. And again, the whole point of having the contraceptive coverage requirement, this is supported by extensive data, the plaintiffs have not rebutted that data, other than just in saying, well, you know, why do you treat churches differently or why do you have an exception for small businesses, which, as I pointed out, would mean, you know, for example, that there's no compelling interest in combating race discrimination. The only thing that they have done then is just say, well, maybe the government could set up some kind of a system in which women did have to take a couple of additional steps to be able to get coverage. And the whole point of this contraceptive coverage requirement is that when there are those burdens, even burdens that may seem a little bit small to you, the result is that women don't get necessary preventative services. And the plaintiffs have just never really addressed that. Now, with respect to substantial burden, I think maybe recognizing that their opt-out or trigger argument kind of proves too much. And Mr. Rasback's brief also makes an argument that at the end of the day, the plaintiffs will end up having to pay for the coverage. We respond to that in the reply brief and he doesn't even try to defend that here. The only other argument that they're left with then is this, they kind of phrase it different ways. They say that they're a vehicle or they have to continue a relationship. And I just want to hone in on this argument because I think the plaintiffs are being quite unclear in exactly what it is that they're saying. If their argument is simply, we object to being in a business relationship with someone, Blue Cross or Aetna, who does something that we object to, then they really are just objecting to a legal obligation that's placed on the third party in the same way that Blue Cross and Aetna are subject to a large number of legal obligations. Now, I think maybe to avoid that, Mr. Rasback at the podium says that no, he says that we're just wrong, that actually they need to go out and hire a third party administrator who will do what the government wants them to do. I mean, that's simply incorrect. Obviously, I leave it to the court to go read the regulations, but the government will approach the same third party administrator or insurance company who the employer or university already works with. So if the employer has Blue Cross provide coverage for their employees, the government will then go to Blue Cross and say, hey, Blue Cross, we want you to provide separate coverage for the employees. And it is entirely separate. I mean, there's no payment, direct or indirect. Blue Cross, not the employer, will send a notice to the employees and say, your employer is not providing contraceptive coverage. Instead, we are going to provide contraceptive coverage. But the one on the ground example that I'm aware of in the Notre Dame case, I forget if it was Blue Cross or Edna, but actually there, the insurance company sent a second insurance card that women would then sort of hand that second card if she were there to get contraceptive coverage. And there's no requirement that a company then go out and find some other third party administrator. And in fact, if I can point you to 78 Fed Reg 39880, that actually addresses what would happen if somebody just didn't have a third party administrator at all. And it says, at least for the time being, the government hasn't dealt with the scenario because it hasn't come up. But it makes clear that if an employer just doesn't have a third party administrator at all, they can just notify the government that they're opting out. And at least until the government can sort of set up a new system to address it, there's just nothing in place. They're not going to be in trouble. They're not required to go find another third party administrator, as Mr. Rasbach suggests. And at the end of the day, I mean, essentially plaintiff's arguments just butt up against the Wheaton College order. The question is, can the government ask the plaintiffs to raise their hand and then rely on their raising their hand for the government to impose a legal obligation or offer to pay Blue Cross and Aetna and companies like that to provide contraceptive coverage for women? And Judge Reveley, if the plaintiffs got what they wanted and were just treated exactly like churches, and of course, post Hobby Lobby, it would then mean that for profit corporations would also have to be treated exactly like churches, then women would not get the coverage, which is exactly what the Supreme Court has claimed twice. Does the court have any other questions? Thank you, Mr. Judge. This case is under submission.